David S. Catuogno
*Admitted pro hac vice*
K&L GATES LLP
One Newark Center, Tenth Floor
Newark, NJ 07102
Telephone: (973) 848-4000
Email: David.Catuogno@klgates.com

Honorable Marc L. Barreca
Chapter 7
Hearing Location: Seattle, Rm. 7106
Hearing Date: March 21, 2024
Hearing Time: 9:30 a.m.
Response Date: March 14, 2024

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

In re:

ASSET REALTY LLC

Debtor.

Case No. 23-10326-MLB

**OBJECTION OF CENTURY 21 REAL ESTATE LLC TO CHAPTER 7 TRUSTEE'S MOTION FOR ORDER AUTHORIZING SALE OF PROPERTY OF THE ESTATE FREE AND CLEAR OF LIENS**

Century 21 Real Estate LLC ("C21"), by and through its undersigned counsel, submits this objection (the "Objection") to the motion of the Chapter 7 Trustee (the "Trustee") for Order Authorizing Sale of Estate Property Free and Clear of Liens (the "Sale Motion") [ECF No. 199] and, in support of its Objection, respectfully states and alleges as follows:

### I. PRELIMINARY STATEMENT

By way of the Sale Motion, the Trustee seeks an order authorizing the sale of a "Lead Generation Program" purportedly consisting of a custom computer program known as the Pipeline CRM and various data regarding individuals[1] and real properties. As described in the Sale Motion, the Pipeline CRM is reportedly a tool previously utilized by Asset Realty LLC (the "Debtor") to gather, unbundle, and store real estate data in a SQL database, which can later be sorted to provide information about real property based on inputted parameters. *See* Sale Motion at p. 2. Accordingly, the Lead Generation Program may include personally identifiable information ("PII"). At the very least, it is a tool to mine and exploit information to generate real estate listings and sales for profit.

---

[1] A). The Sale Motion does not provide any protections under 11 U.S.C. § 107(c)(1) or 18 U.S.C. § 1028(d). It appears that this information may include PII as defined under 11 U.S.C. § 101 (41

1

The overarching problem with the Sale Motion is it is not a sale at all, but rather is a thinly veiled pretense allowing the Trustee to essentially continue operations in a Chapter 7 liquidation without Court authority under 11 U.S.C. § 721. The Sale Motion attempts to contort the transaction where the Trustee "sells" a supposed revenue producing asset, but all revenue generated must be deposited into an estate account maintained by the Trustee and all events giving rise to any payment expectation (*i.e.,* sale contract, sale closing, etc.) happen in the future and therefore contemplate some form of continuing "operations." Further, a large portion (40%) of the funds deposited in the estate account will be retained by the Trustee with the rest disbursed out to Chad Storey ("Storey" or the "Purchaser"), the former principal of the Debtor who will be collecting the revenue – *a la* a commission. While Storey is ostensibly the Purchaser, he isn't really purchasing anything; he has merely been deputized to collect purported future revenue and retain a portion of the collections for himself: After, of course, the Trustee gets his cut.

Additionally, the proposed transaction does not embody any of the traditional characteristics of a purchase and sale. There is no defined purchase price. There is just a percentage of collections to be retained by the Purchaser. There is no required deposit up front or initial installment payment towards the purchase. There is no meaningful guarantee of any payment to the Estate whatsoever. Indeed, while the Sale Motion recites to a minimum payment of $100,000, there is no competent support for that statement. There is no realistic projection as to the expected revenue, or quantification as to the universe of potential future revenue, nor are there any teeth to the supposed "guarantee' minimum payment.

Additionally, the proposed sale does not meet the standards for approval of such sale under Section 363 of the Bankruptcy Code; particularly the baseline requirements that the proposed sale be in good faith and in the best interests of the estate. The proposed terms of the sale are tilted to provide undue advantage to Storey over any other potential bidder. Moreover, the Lead Generation Program has already spawned a potential class action lawsuit brought by David Kovanen (the "Kovanen Litigation") which alleges that the Debtor and Storey violated Washington State law in operating the Lead Generation Program. Specifically, the Kovanen Litigation alleges that the Debtor sent thousands of unauthorized text messages to individuals in violation of the Washington

2

Commercial Electronic Mail Act ("CEMA") RCW 19.190, *et seq.* Mr. Kovanen has filed a claim in the Debtor's bankruptcy case in the amount of over $327 million flowing from these alleged violations (the "Kovanen POC").

Moreover, C21 has been hauled into the Kovanen Litigation as a defendant despite having nothing to do with the Pipeline or the Lead Generation Program, simply by virtue of its former franchise relationship with the Debtor. By contrast, not only will the Trustee have "something to do" with the continued operation of the program, he has contrived a transaction where the estate is affirmatively enabling its continued operation through a proxy to the bankruptcy estate. Continued operation of the Pipeline business could well subject the Estate to liability in the Kovanen Litigation.

Additionally, C21 and Kovanen are likely the two largest unsecured creditors in this case. Simply stated, a "sale of assets" (which may well actually include the purchase of liabilities) that is offensive and anathematic to the major creditors of the Estate cannot be said to be in the best interests of the Estate.

Even if the above were not true, the sale is not approvable as it violates state and federal law prohibiting the sharing of real estate brokerage commissions. Both Chad Storey and the Trustee have submitted Declarations supporting the Sale Motion admitting that the revenue produced by the Lead Generation Program derives exclusively from real estate sales commissions payable to the broker of record at a closing. Thus, the funds that may be deposited into the estate account would necessarily represent a shared real estate commission. The Trustee, however, is not a licensed broker and both Washington state and federal law prohibit the sharing of real estate commissions with non-brokers. Thus, the proposed transaction is unlawful.

In sum, the Trustee has proposed a structurally inadequate and defective transaction that is not in the best interests of the estate, that perpetuates potential violations of Washington state law, that is antithetical to the interests of the majority of the creditor body, and that is patently illegal under state and federal law. Accordingly, the Sale Motion must be denied.

3

## II. RELEVANT FACTS

On February 22, 2023 (the "Petition Date") Asset Realty filed a petition for relief under chapter 11of the Bankruptcy Code. [ECF No.1]. As of the Petition Date, the Debtor was operating a real estate brokerage office located at 121 Lake Street S, Suite 201, Kirkland, Washington as an independently owned and operated brokerage subject to a franchise agreement with C21.

C21 and the Debtor were parties to a Franchise Agreement dated September 24, 2015 together with related agreements, (the "Franchise Agreement") pursuant to which the Debtor was authorized to operate one or more real estate brokerage office(s) utilizing the Century 21® Marks and System.[2] As of the Petition Date, the Debtor was indebted to C21 in the amount of at least $919,326.75 under the Franchise Agreement (the "Pre-Petition Indebtedness").[3]

Prior to the Petition Date, the Debtor and Storey operated the Lead Generation Program. Also prior to the Petition Date, David Kovanen initiated the Kovanen Litigation alleging, among other things, that the Debtor and Storey sent thousands of text messages to individuals without the necessary authorization(s) in violation of CEMA. The Kovanen POC was filed in the amount of $327,751,500 (Claim No. 9-1). On May 26, 2023, the Debtor filed an Objection to the Kovanen POC [ECF No. 66]. On July 11, 2024, the parties entered into a Stipulation staying the Debtor's objection to the Kovanen POC pending resolution of the related litigation between the parties.[ECF No. 83].

The Debtor filed a subchapter V plan on May 23, 2023 [ECF No. 63] and, on August 17, 2023, transmitted a letter to the Court requesting that the confirmation hearing be struck. [ECF No. 98]. The Debtor thereafter advised that it intended to seek dismissal of the case as there was no path to confirmation. [ECF No. 112]. The Court ordered the Debtor to file a plan or a motion to dismiss by December 1, 2023. [ECF No. 118]. On December 1, 2023, Asset Realty filed a Second Amended

---

[2] A copy of the Franchise Agreement is attached to the proof of claim previously filed herein by C21 designated as Claim No. 5-2 (the "C21 POC") as **Exhibit A.**

[3] Substantially contemporaneous with this Motion, C21 is filing a Second Amended Proof of Claim in the amount of the Pre-Petition Indebtedness. The prior filed C21 POC (Claim No. 5-2) was filed in the amount of $290,933.59.

Plan of Reorganization. [ECF No. 130]. That same day, the United States Trustee filed a motion to dismiss or convert the chapter 11 proceeding (the "Motion to Convert"). [ECF No. 128].

On December 22, 2023 (the "Conversion Date"), the Court entered an order converting the case to chapter 7 [ECF No. 157] and Edmund J. Wood was appointed as Chapter 7 Trustee. [ECF No. 158].

On December 23, 2023, C21 filed a Motion for Relief from the Automatic Stay and Surrender of Collateral (the "Stay Motion"). [ECF No 165]. On February 21, 2024, the Court entered an Order granting stay relief to C21 authorizing it to terminate the Franchise Agreement between it and the Debtor. [ECF No. 198].[4]

On February 21, 2024, the Trustee filed the Sale Motion seeking to sell the Lead Generation Program to Storey. The Sale Motion includes a purchase and sale agreement ("PSA") that does not identify a purchase price or require any deposit or up-front payment, but rather, the "purchase price" is a percentage of speculative amounts to collected by the Purchaser; unless the ultimate buyer is someone other than Storey. Per the PSA, any other buyer would be required to pay $50,000 up front. The PSA also establishes a payment protocol where, despite ostensibly "owning" the asset, the buyer would be required to deposit **all** revenue collected under the program in the Trustee's estate account. The Trustee would retain a 40% cut of the sums deposited and remit the remaining 60% to the "owner."

The PSA states that the Purchaser will pay a minimum of $100,000 which presumes that the Purchase will collect at least $250,000 under the Lead Generation Program. There is nothing in the Sale Motion to support that level of expected revenue. No appraisal. No projections. No quantification of any kind. Further, if there is insufficient revenue to make the $100,000 minimum payment, the Sale Motion does not say how and when that minimum payment will be made or how it will be collected. The bottom line is that the entire purchase price is speculative.

The Sale Motion is supported by a Declaration of Edmund Wood Chapter 7 Trustee (the "Trustee Declaration") and a Declaration of Chad Storey (the "Storey Declaration").

---

[4] C21 terminated the Franchise Agreement by letter dated February 23, 2024.

5

The Storey Declaration describes the revenue mechanism for the Lead Generation Program as follows:

> any sales transaction which closed as a result of a lead provided to the agent from the Lead Generation Program created an account receivable commission owed to the Debtor ("Accounts Receivable Commission").
>
> The Accounts Receivable Commission payable to the Debtor equals 25% of the commission owed to the broker (or in some circumstances where the lead is an old lead, 30% of the commission owed to the broker is payable to the Debtor).
>
> The agreement with the brokers permitted the Debtor to collect the Accounts Receivable Commissions directly from the escrow company closing the sale.

Storey Declaration at paras 7-9. Thus, as established by the Storey Declaration, the revenue produced by the Lead Generation Program consists exclusively of a portion of the real estate commission earned by, and paid to, the listing broker at the closing of sale.

In terms of the Trustee Declaration, the Trustee avows that he has "neither the expertise in operating the Lead Generation Program nor the time to invest in undertaking such a monumental task to monitor the system[5], contact brokers using the Lead Generation Program on a daily basis, contact escrow and collect the Accounts Receivable Commissions." *See* Trustee Declaration at para 6. This admission as to the lack of expertise confirms that the Trustee would not be providing any services in collecting revenue under the program, but rather outsourcing collections and waiting to collect his cut.

The Trustee also asserts that Storey is the only party that can properly monetize the Lead Generation Program stating at para. 21 that "I set $50,000 as the additional consideration for any Competing Purchaser because I am concerned that any Competing Purchaser … will not have the expertise to operate the Lead Generation System, which could result in far less proceeds coming to the estate than what we are likely to realize in a sale to the Purchaser."

The Trustee Declaration also asserts that "[t]he present offer will enable … [the Trustee] to pay Chapter 7 administrative costs and make a distribution to creditors." *See* Trustee Declaration at

---

[5] Storey would therefore be monitoring the Lead Generation System.

6

para. 17. The Trustee does not offer any support this statement as projected revenue from this purported sale is speculative at best (and disregards obvious potential liabilities to the estate).

## III. ARGUMENT

### A. The Sale Motion Does Not Address Requirements of 11 U.S.C. § 363(b)

Section 363(b)(1) authorizes the trustee to use, sell, or lease property of the estate other than in the ordinary course of business. 11 U.S.C. § 363(b)(1). However, the Code sets forth substantial restrictions concerning the disposition of PII. The Sale Motion does not address the possibility that the Pipeline may contain data that is considered PII under the Bankruptcy Code. *See* 11 U.S.C. § 101(41)(A)

"If the debtor in connection with offering a . . . a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case," then the trustee may not sell the information except in accordance with such policy or, after appointment of a consumer ombudsman and notice and a hearing, with court approval. *Id.* Here, the Sale Motion contains no information about whether the proposed sale includes PII or the Debtors' policies, if any, regarding the sale of PII. Accordingly, there is no basis to support a finding that the proposed sale complies with the applicable requirements relative to the sale of PII.

Additionally, to the extent there may be PII involved in the proposed sale, the Trustee must provide notice and an opportunity for a hearing before property may be sold, other than in the ordinary course of business. *Id.;* Indeed, it is well settled that Bankruptcy Code "[s]ubsection (b) specifically requires a 'notice and a hearing.'" *U.S. v. Moberg Trucking, Inc. (In re Moberg Trucking, Inc.)*, 112 B.R. 362, 363 (9th Cir. B.A.P. 1990); *see also Holta v. Zerbetz (In re Anchorage Nautical Tours, Inc.)*, 145 B.R. 637, 642 (9th Cir. B.A.P. 1992) ("Under § 363(b), a notice and a hearing are required for . . . [the] sale of an asset of the estate.").

The Sale Motion does not provide notice to any party that is not actively involved in the bankruptcy case. Accordingly, to the extent that the proposed sale involves PII, C21 submits that the proposed sale cannot be approved without providing notice to the people who will be most affected by the sale.

7

Additionally, although the Bankruptcy Code contains no guidance regarding the circumstances under which a sale of assets can be approved (except that notice and a hearing must be provided), the seminal case of *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986) interpreted Section 363(b) to require a finding by the bankruptcy court that the purchaser of a debtor's assets is a good faith buyer, meaning one purchasing "in good faith" and for "value." *Abbotts Dairies,* 788 F.2d at 147.

In assessing this standard, a proposed sale transaction is to be scrutinized by the Court as to numerous factors such as purchase price; proceeds to be received by the estate; the good faith of the parties; the existence of self-dealing/collusion; whether negotiations were conducted in good faith; and fundamentally, whether the proposed sale is in the best interest of the estate. *In re Childers,* 526 B.R. 608, 613 (Bankr. D.S.C.) 2015); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841-842 (Bankr. C.D. Cal.1991).

Here, the proposed sale does not satisfy the "good faith" standard in that (a) there has been no evidence or indication that the Lead Generation Program was exposed to the market, (b) the Sale Motion is slanted to the advantage of Storey, imposing more onerous sale terms on any competing bidder, and (c) creditors other than the Chapter 7 administrative creditors are not likely to benefit from the proposed sale. To the contrary, the likely two largest creditors have either objected to the sale or have alleged damages resulting from the prior operation of the asset being "sold." Ironically, any funds remaining after payment of Chapter 7 administration likely would be disbursed to parties preferring that the Lead Generation Program be abandoned and shut down rather than sold and perpetuated.

Moreover, despite the existence of the Kovanen Litigation which attacks the Lead Generation Program as a vehicle for the violation of Washington state law, there is nothing in the Sale Motion to govern the conduct of the program going forward, *i.e.,* to install controls to ensure that it is operated in compliance with applicable law.

The Sale Motion also fails the "value" test. There is nothing in the record on which the Court can make a determination that the proposed sale is for value. There is no appraisal. No quantification as to the universe of receivables in existence. No projections as to expected revenue. No defined sale

8

price other than as a percentage of revenue that might possibly be collected. There is no protocol for the payment of the purchase price other than as a percentage of what is collected. Indeed, while the Sale Motion asserts that the Trustee is taking a security interest in the asset to assure payment, the Trustee's Declaration also admits that he lacks the expertise to monetize the asset on his own without the specific assistance of Storey. That being the case, the security interest is rather meaningless.

There is also the very real possibility that the estate could be subject to liability by enabling and profiting from a program, where the continued operation of which may violate applicable law. There is no analysis that the amounts to be received by the Estate would exceed the amount of the Estate's potential exposure. In sum, there is no basis to conclude that any value will be realized by the estate.

**B.     The Sale Motion Does Not Meet the Requirements of 11 U.S.C. § 363(m)**

In order to approve a sale, courts require that the sale price be fair and reasonable, and that the sale be the result of good faith negotiations with the buyer. *See, e.g.*, *In re Ewell*, 958 F.2d 276 (9th Cir. 1992); *In re King-Wilson*, 1998 U.S. Dist. LEXIS 16595 at *11–12 (N.D. Cal. Oct. 13, 1998); *see also, e.g.*, *In re Abbotts Dairies of Pa.*, 788 F.2d 143, 147–50 (3d Cir. 1986).

Although the Bankruptcy Code does not define "good faith purchaser," the Ninth Circuit, construing section 363(m) of the Bankruptcy Code, has stated, "[a] good faith buyer 'is one who buys 'in good faith' and 'for value.'"" *Ewell v. Diebert (In re Ewell)*, 958 F. 2d 276, 281 (9th Cir. 1992) (*citing Abbotts Dairies*, 788 F.2d at 147). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the Sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (*quoting In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1998 (7th Cir. 1978)). Here, for the reasons stated above, the evaluation of the facts of this case compel the conclusion that Storey is not a good faith purchaser.

9

### C. The Proposed Sale Violates State and Federal Law Prohibiting the Sharing of Real Estate Commissions

Under Washington law, one must be a licensed real estate broker to lawfully receive a real estate brokerage commission, or any part thereof. Specifically, RCW 18.85.301 provides that:

> (1) … it is unlawful for any licensed firm, broker, or managing broker to pay any part of the licensee's commission or other compensation to any person …who is not a licensed firm, real estate broker, or managing broker ….
>
> (2) … it is unlawful for any licensed real estate firm to pay any part of the firm's commission from brokerage services or other compensation to a real estate broker or managing broker not licensed to do business for the firm.

Additionally, RCW 18.85.331 provides that:

> It is unlawful for any person to act as a real estate broker, managing broker, or real estate firm without first obtaining a license therefor, and otherwise complying with the provisions of this chapter.
>
> No suit or action shall be brought for the collection of compensation as a real estate broker… without alleging and proving that the plaintiff was a duly licensed real estate broker, …before the time of …procuring any promise or contract for the payment of compensation for any contemplated real estate transaction.

Pursuant to the Storey Declaration, it is indisputable that all revenue under the Lead Generation Program constitutes real estate commission earned by, and paid to, a listing broker in connection with a closed real estate transaction. There is nothing in the record in this case establishing, or even suggesting that the Trustee is a real estate broker. Accordingly, based on Washington law, it is unlawful for the Trustee to receive any portion of this real estate commission. That is a death knell for the Sale Motion as the proposed transaction requires the portion of the listing broker's commission "earned" under the Lead Generation Program to be deposited directly into an Estate account maintained by the Trustee. Additionally, C21 notes that if Storey were to fail to follow the payment protocol or make the minimum payment, RCW 18.85.331 absolutely bars the Trustee from seeking to collect such payment because the Trustee is not a licensed broker.

As if the clear mandates of Washington law were not sufficient to doom the Sale Motion, the transaction proposed by the Trustee also violates federal law, namely the Real Estate Settlement Procedures Act ("RESPA") 12 U.S.C. § 2601 *et seq*. That law provides that

10

> (b) No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.
>
> \*\*\*\*
>
> (c) Nothing in this section shall be construed as prohibiting… (3) payments pursuant to cooperative brokerage and referral arrangements or agreements between real estate agents and brokers,…

12 U.S.C. § 2607.

Under the plain language of RESPA, no party can receive any portion of a real estate brokerage commission[6] for any reason other than for "services actually performed." Under the "sale" engineered by the Trustee in this case, the Trustee does not perform any actual services. In fact, the Trustee does not do anything but wait for Storey to chase revenue and then bring the Trustee his cut.

C21 notes that subsection (c) of Section 2607 could rescue the Trustee if he was a broker … but he is not. Moreover, even if the Trustee were a broker, subsection (c) would not excuse his failure to perform any "actual" service in the settlement transaction. Accordingly, RESPA bars the Trustee from receiving any part of the listing broker's commission and therefore precludes the estate from deriving revenue from the Lead Generation Program.

### IV. CONCLUSION

For the foregoing reasons, C21 respectfully submits that the Sale Motion should be denied.

DATED this 14th day of March, 2024.

        K&L GATES LLP

        By: */s/ David S. Catuogno*
        David S. Catuogno (Admitted *Pro Hac Vice*)
        One Newark Center, 10th Floor
        Newark, NJ 07102
        Telephone: 973.848.4018
        Facsimile: 973.848.4001
        Email: David.Catuogno@klgates.com

        *Attorneys for Century 21 Real Estate LLC*

---

[6] Brokerage commissions are specifically defined as a settlement service under RESPA.

# CERTIFICATE OF SERVICE

The undersigned declares as follows:

That she is a practice assistant in the law firm of K&L Gates LLP, and on March 14, 2024, she caused the foregoing document to be filed electronically through the CM/ECF system which caused Registered Participants to be served by electronic means, as fully reflected on the Notice of Electronic Filing.

I declare under penalty of perjury under the laws of the State of Washington and the United States that the foregoing is true and correct.

Executed on the 14th day of March, 2024 at Seattle, Washington.

*/s/ Chloe Morse*
Chloe Morse